## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **MICHELE M.,**[1] | ) | |
| | ) | **No. 20 CV 7749** |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **KILOLO KIJAKAZI, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | **May 16, 2023** |
| **Defendant.** | ) | |

### MEMORANDUM OPINION and ORDER

Michele M. seeks disability insurance benefits ("DIB") asserting she is disabled by various medical conditions, including fibromyalgia, chronic pain, chronic fatigue, depression, anxiety, and PTSD. Before the court are the parties' cross motions for summary judgment. For the following reasons, Michele's motion is denied, and the government's is granted:

### Procedural History

Michele filed her application for DIB in March 2018, alleging disability onset in November 2017. (Administrative Record ("A.R.") 19, 221-22.) At the administrative level, her application was denied initially and upon reconsideration. (Id. at 19, 115-28, 130-48.) She then sought and was granted a hearing before an Administrative Law Judge ("ALJ"). (Id. at 19, 171-85, 187-209.) Michele appeared with a non-attorney representative at the January 2020 hearing, during which

---

[1] Pursuant to Internal Operating Procedure 22, the court uses Plaintiff's first name and last initial in this opinion to protect her privacy to the extent possible.

Michele and a vocational expert ("VE") testified. (Id. at 19, 68-114.) The ALJ ruled in May 2020 that Michele was not disabled. (Id. at 19-37.) The Appeals Council denied Michele's request for review, (id. at 1-7), making the ALJ's decision the final decision of the Commissioner, *see Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Thereafter, Michele filed this lawsuit seeking judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 7).

## Analysis

Michele argues that the ALJ's decision cannot stand because: (1) the Commissioner's appointment violates constitutional separation of powers; (2) the ALJ did not account for all of her impairments when crafting her residual functional capacity ("RFC"); (3) the ALJ failed to properly evaluate Michele's therapy notes; and (4) the ALJ's symptom assessment was deficient. (R. 16, Pl.'s Mem.) When reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and her decision has the support of substantial evidence, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This deferential standard precludes the court from reweighing the evidence or substituting its judgment for the ALJ's, allowing reversal "only if the record compels" it. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted). In this circuit the ALJ must also "provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021). Put another way,

the ALJ's "analysis must say enough to enable a review of whether the ALJ considered the totality of a claimant's limitations." *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021). Having considered Michele's arguments and the record, the court concludes that the ALJ supported her decision with substantial evidence.

## A.     Separation of Powers

The court addresses Michele's constitutional argument first as it may be dispositive. Michele argues that her case should be remanded because the Social Security Administration ("SSA") is unconstitutionally structured. (R. 16, Pl.'s Br. at 15-16.) Michele relies on *Seila Law LLC v. Consumer Financial Protection Bureau* ("CFPB"), 140 S. Ct. 2183, 2197 (2020), in which the Supreme Court held that "the CFPB's leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers." Michele contends that the SSA's structure mirrors the CFPB's insofar as the SSA has a single Commissioner who may be removed only for cause and serves a term longer than that of the President of the United States, as set forth in 42 U.S.C. § 902(a)(3). (R. 16, Pl.'s Br. at 15-16.) As such, Michele asserts that the Commissioner's authority is "constitutionally invalid" and she was deprived of a "valid administrative adjudicatory process." (Id. at 16.)

The government concedes that the SSA's structure "violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." (R. 22, Govt.'s Mem. at 2.) But it asserts that no separation-of-powers concerns apply here because the ALJ who denied the current claim had her appointment ratified by then-Acting Commissioner Nancy Berryhill,

who was not appointed pursuant to Section 902(a)(3) and could be removed at will, thus eliminating any possibility of a constitutional violation. (Id. at 3-5.)

Regardless, the year after the Supreme Court decided *Seila*, it held in *Collins v. Yellen*, 141 S. Ct. 1761, 1783 (2021), that an unconstitutional removal restriction does not render invalid the lawful appointment of an agency head. *See Teddy J. v. Kijakazi*, No. 21 CV 1847, 2022 WL 4367577, at \*2 (N.D. Ill. Sept. 21, 2022); *Michelle D. v. Kijakazi*, No. 21 CV 1561, 2022 WL 972280, at \*6 (N.D. Ill. March 31, 2022). Here, Berryhill was lawfully appointed, and there is "no basis for concluding that [she] lacked the authority to carry out the functions of the office." *Collins*, 141 S. Ct. at 1788.

Even if Michele could mount a constitutional challenge based on Section 902(a)(3), she cannot show the requisite nexus between that provision's removal restriction and any harm to her. (R. 22, Govt.'s Mem. at 5-6.) In the wake of the *Collins* decision, "numerous courts have ruled that a frustrated Social Security applicant . . . must show that the unconstitutional removal provision actually harmed her in some direct and identifiable way." *Cheryl T. v. Kijakazi*, No. 20 CV 6960, 2022 WL 3716080 (N.D. Ill. Aug. 29, 2022) (collecting cases). Michele does not identify any direct harm in her motion, (R. 16, Pl.'s Br. at 7-10), and she suggests in her reply that *Collins* does not apply and harm may be presumed, (R. 23, Pl.'s Reply at 10). But Michele's position goes against the tide, and the court declines to infer the harm required. *Collins*, 141 S. Ct. at 1789.

B.    **RFC Assessment**

Michele argues that the ALJ's RFC assessment is flawed.  (R. 16, Pl.'s Br. at 8-12.)  When assessing the RFC, the ALJ must "evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling."  *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009).  Michele contends that the ALJ failed to comply with this standard and did not account for all limitations when assessing her RFC.[2]  (R. 16, Pl.'s Br. at 8-9.)  The court disagrees.

Michelle points to her chronic fatigue and argues that the ALJ failed to include a limitation requiring her to nap during the day.  (Id. at 9-10.)  But the ALJ recognized Michele's chronic fatigue, deeming it a "severe" impairment and citing Michele's reports of being "tired throughout the day," (A.R. 28 (citing id. at 376)), as well as her testimony that "her lack of sleep makes her very foggy and affects her reaction time and decision making," (id. at 22, 27).  The ALJ also discussed medical evidence showing Michele had made "nice progress with a more intensive program of physical therapy, which . . . focus[ed] on sleep hygiene," (id. at 28 (citing id. at 372)), and had been "working with a sleep specialist, using a lamp, and taking melatonin," (id. (citing

_____

[2]  Michele also asserts that the ALJ erred by finding the state agency consultants' opinions persuasive, even though they found only two of Michele's impairments—fibromyalgia and depression—to be severe whereas the ALJ found an additional nine impairments to be severe.  (R. 16, Pl.'s Br. at 8-9.)  As the government correctly explains, however, a finding that Michele "had more severe impairments than [the state agency consultants] concluded does not undermine the sufficiency of the ALJ's analysis, especially when it is a finding resolved" in the claimant's favor.  (R. 22, Govt.'s Mem. at 19.)

id. at 456)).  The ALJ also noted that despite reports of fatigue, Michele presented as "alert, awake, and oriented."  (Id. (citing id. at 458, 490).)  Further, the ALJ concluded that while a November 2018 sleep study revealed obstructive sleep apnea, (id. at 29 (citing id. at 795 (noting "sub-optimal[] complian[ce]" with treatment))), Michele had improved with light and BiPAP therapy, (id. (citing id. at 793, 795)).  And the ALJ noted that a February 2020 treatment record assessed her as having "[s]leep apnea, largely treated."  (Id. (citing id. at 933 (noting Michele "has benefited from therapy in that she is sleeping more, however she remains exhausted during the day despite apparently adequate total sleep time and PAP compliance")).)

In short, the ALJ considered the numerous references to Michele's fatigue in the medical record and testimony and accounted for her "complaints of pain and fatigue" by limiting her to light work with exertional and non-exertional limitations. (Id. at 30.)  In terms of exertional restrictions, Michele could: "never climb ladders, ropes, or scaffolds; no more than occasionally climb ramps or stairs, balance, stoop, crouch, kneel, or crawl; and never work at unprotected heights [or] around hazardous machinery, or perform commercial driving."  (Id.)  She also should "avoid concentrated exposure to extreme cold, heat, humidity, []wetness[,] . . . [and] vibration" and "work on a flat even surface."  (Id.)  And "to account for [Michele's] reports that her lack of sleep makes her very foggy and affects her reaction time and decision making," the ALJ limited Michele to "simple routine work with no fast paced production, strict production, or hourly requirements."  (Id.; see also id. at 32-33

6

(noting mental limitations assessed to account for moderate limitations in concentration, persistence, and pace ("CPP") and interacting with others).)

The ALJ rejected any limitations to account for her need to nap, finding that "[m]ore restrictive findings are not supported by the evidence," (id. at 30). The ALJ explained that "physical examinations [] often described [Michele] as alert, oriented, and awake," even though on some occasions she did appear tired. (Id. at 31.) The ALJ also noted that Michele's "memory and concentration showed some minor deficits, mood was depressed and affect was mildly blunted." (Id. (citing id. at 426, 898-913 (treatment notes from Michele's psychiatrist)). Nevertheless, Michele's "fund of knowledge was adequate, her insight was fair, and her judgment was intact," according to the ALJ. (Id.; see also id. at 32 (citing id. at 403-04, 742, 745, 747, 749).) The government also correctly points out that no "treating, examining, or reviewing physician" concluded Michele needed to lie down during the day. (R. 22, Govt.'s Mem. at 17.)

Michele next faults the ALJ for failing to include in the RFC a limitation requiring her to elevate her legs. (R. 16, Pl.'s Br. at 10-11.) Again, the ALJ considered Michele's edema and concluded that although her vein clinic diagnosis constituted a severe impairment, the medical evidence and treatment did not support her alleged need to elevate her legs. (A.R. 22.) Specifically, the ALJ considered treatment notes indicating Michele complained of moderate "pain, heaviness, warmth, swelling, restlessness, and burning in her legs" and was diagnosed with leg edema. (Id. at 29 (citing id. at 735, 738, 799).) At the same time, on examination her "pulses were

palpable, she did not exhibit any neurological deficits, and there were no varicose veins and normal deep venous system bilaterally with no evidence of thrombosis or obstruction." (Id. (citing id. at 738-39).) She was prescribed a tactile pump in December 2018 and by mid-2019 her symptoms were "considerably alleviated" and then "well controlled." (R. 22, Govt.'s Mem. at 16 (citing A.R. 29, 802-03).) The ALJ found "no evidence that [Michele] was advised to elevate her legs," (A.R. 31), and the state agency consultants—whose opinions the ALJ deemed "persuasive"—limited Michele to light work with postural restrictions, without finding she needed to elevate her legs either, (id. at 33 (citing id. at 127, 142-43)).

Michele also complains that the ALJ erred by failing to find that her obsessive-compulsive disorder ("OCD") symptoms, including her need to check and re-check her work, would require her to be off task more than 10 percent of the time, rendering her disabled according to the VE. (R. 16, Pl.'s Br. at 11-12.) But the ALJ found that Michele's OCD was a severe impairment and acknowledged her reports that she "constantly checks and cleans things," (A.R. 22, 26-27), as well as treatment notes revealing mild concentration deficits. From there, the ALJ determined that Michele has a moderate CPP limitation and accounted for that deficit by restricting Michele to "simple routine work, with no fast-paced production such as assembly line or work where the machine sets a pace; [and] work is of a variable rate, with no strict production or hourly requirements[,] end of the day work goals, and no tandem work." (Id. at 26, 32.) In so finding, the ALJ relied on the state agency consultants who found that Michele "had the cognitive capacity to perform simple and detailed tasks,"

although the ALJ's RFC is more restrictive. (Id. at 33.) This is not a case in which the ALJ failed to grapple with the evidence. Instead, she considered and weighed the evidence and assessed an RFC supported by substantial evidence. The court therefore finds that the ALJ sufficiently evaluated Michele's chronic fatigue, edema, and OCD and adequately accounted for them in the RFC analysis.

## C.   Therapy Notes

Michele says the ALJ erred by improperly weighing her therapist Vicki Custer's notes. (R. 16, Pl.'s Br. at 12-13.) In evaluating Custer's notes, the ALJ noted the frequency with which Michele missed or was late to therapy appointments, which led the ALJ "to question [Michele's] ability to attend work consistently and on time; as well as difficulty with concentration and focus and an inability to follow directions or simple tasks." (A.R. 33.) However, the ALJ set these concerns aside because there were "no clinical assessments [on] which to base these assertions." (R. 16, Pl.'s Br. at 12-13 (citing A.R. 33).) Michele claims the ALJ was required to explain why "additional clinical assessment[s]" were necessary as to her ability to be on time. (Id. at 12.) But during the hearing the ALJ answered this question, explaining that she needed to review "progress notes" or other objective data to evaluate the persuasiveness of Custer's opinion. (A.R. 98); see also 20 C.F.R. § 404.1520c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] . . . the more persuasive the medical opinion[] . . . will be."). As part of this inquiry, the ALJ indicated she is required to consider the supportability and consistency of the opinion

with other objective evidence. (Id.); *see also* 20 C.F.R. § 404.1520c(a) (stating that "most important factors" considered in evaluating "persuasiveness of medical opinions and prior administrative medical findings are supportability . . . and consistency"). Although the ALJ recognized that Michele's inability to attend or be on time for therapy sessions could suggest an inability to sustain full-time work, she reasoned that this was not a basis on which she could find an inability to work because the therapist's notes "simply consist[ed] of a summary of therapy sessions and discussions" without reflecting "any clinical objective examinations of mental status." (A.R. 33.) The ALJ was entitled to discount the notes based on the lack of reliability. *See* 20 C.F.R. § 404.1520c(c)(1).

## D. Symptom Assessment

Michele argues that the ALJ failed to properly consider her subjective symptom statements. (R. 16, Pl.'s Br. at 13-15.) In assessing a claimant's subjective reports, an ALJ considers: (1) objective medical evidence; (2) daily activities; (3) frequency and intensity of pain or other symptoms; (4) medication, treatment, and other measures to relieve pain or other symptoms; and (5) functional limitations. *See* SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). An ALJ's symptom evaluation is generally entitled to great deference because she can observe the claimant's credibility firsthand. *See Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). As such, a court will not disturb the evaluation if it is based on specific findings and evidence and not "patently wrong"—that is, so long as it does not "lack[] any explanation or support." *Id.* at 815-16 (citing *Elder*, 529

F.3d at 413-14); *see also Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) (stating that court's review of ALJ's symptom assessment is "extremely deferential").

Michele challenges the ALJ's reliance on her daily activities, without considering the limitations she experiences when performing those activities. (R. 16, Pl.'s Br. at 13-14.) Under SSR 16-3p an ALJ must consider the claimant's daily activities. *See* 20 C.F.R. § 404.1529(c)(3). Here, the ALJ did so, noting that Michele cared for her 15-year-old autistic son, including by preparing meals, performing household chores, and driving him. (A.R. 24, 31.) The ALJ also noted treatment records in which Michele's providers "encouraged [her] to exercise," and reported that she generally exercises four days a week, including by swimming. (Id. at 30.) The ALJ concluded that this evidence undermines Michele's allegations of disabling physical symptoms. (Id. at 31.)

Michele complains that the ALJ erred by not considering her limitations when performing these activities. (R. 16, Pl.'s Br. at 13-14.) But as the government points out, the ALJ addressed some of these qualifications. (R. 22, Govt.'s Mem. at 26.) For example, the ALJ noted Michele's testimony that although she can do laundry and wash dishes, she "needs to take breaks due to her physical impairments." (A.R. 24-25.) The ALJ also acknowledged Michele's reports that she "has difficulty doing household chores such as sweeping and mopping due to her OCD," and her psychiatrist's treatment note recording "mild deficits in concentration." (Id. at 24.) Insofar as Michele argues that the ALJ also should have credited her testimony that

she needed to nap during the day, (R. 16, Pl.'s Br. at 13), the ALJ considered such reports but found that the record evidence did not support them, (A.R. 30-32).

Michele further challenges the ALJ's reliance on her ability to care for her teenage son, despite the Seventh Circuit's admonition that "sheer necessity may compel one to perform tasks at home no matter how painful, such as taking care of one's child." *Forsythe v. Colvin*, 813 F.3d 677, 679 (7th Cir. 2016) ("[E]xtrapolating from what people do at home, often out of necessity, to what they could do in a 40-hour-a-week job is perilous. At home one has much greater flexibility about when and how hard and how continuously to work; one can rest during the day (which one can't do in a 9-to-5 job)." (citations omitted)). Although an ALJ's "unrealistic and exaggerated reliance upon" childcare activities can result in reversal, the Seventh Circuit has confirmed that "[s]uch evidence of daily activities is relevant . . . [and] can be helpful in evaluating conflicting evidence about a person's limitations." *Chambers v. Saul*, 861 Fed. Appx. 95, 101 (7th Cir. 2021). Here, the ALJ did not place "unrealistic" or "exaggerated reliance" on Michele's caring for her son. *Id.* And even if she had, she offered several reasons to support her symptom assessment, such as Michele's ability to perform household chores and exercise, and only one had to be valid. *See Kittelson v. Astrue*, 362 Fed. Appx. 553, 558 (7th Cir. 2010) (finding that ALJ's specification of "another, valid reason" for discounting subjective symptom allegations "provided a sufficient basis for the ALJ's adverse" symptom assessment).

As to her exercising, Michele contends that the ALJ failed to explain "why her efforts to follow recommendations from her doctors suggested that she exaggerated

her symptoms." (R. 16, Pl.'s Br. at 14.) But the ALJ was entitled to consider the extent of her exercising—generally four days a week—as part of her daily activities. *See Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016). The ALJ did not conflate Michele's ability to exercise four times a week with her ability to sustain full-time, competitive work, as she suggests. (R. 16, Pl.'s Br. at 14.) Rather, the ALJ discussed "specific findings and evidence" regarding Michele's exercising four times per week, *Murphy*, 759 F.3d at 815, and found that her exercising and other daily activities conflicted with her reported limitations," *Chambers*, 861 Fed. Appx. at 101. The court thus finds no error on this ground.

Finally, Michele asserts that the ALJ did not adequately consider her medications. (R. 16, Pl.'s Br. at 14-15.) But the government is correct that the ALJ considered Michele's treatment and medication, (A.R. 28-32), and concluded that Michele's pain and functioning improved in response, (see, e.g., id. at 29, 31-32). The court thus agrees with the government that Michele's argument is tantamount to a request to reweigh the evidence, which it cannot do, (R. 22, Govt.'s Resp. at 25), and that the ALJ supported her symptom assessment with substantial evidence.

## Conclusion

For the foregoing reasons, Michele's motion for summary judgment is denied, and the government's is granted.

**ENTER:**

Young B. Kim
**United States Magistrate Judge**

13